# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES, *ex rel.* KAREN CHILCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  09-cv-4018 |
| | ) | |
| KBR, INC., KELLOGG BROWN & ROOT SERVICES, INC., and KELLOGG BROWN & ROOT LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>O R D E R  &  O P I N I O N</u>

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Doc. 49). Also pending is Defendants' Motion for Leave to File a Reply Brief, which is opposed by Plaintiff; the United States has also filed a "Statement of Interest," and Defendants have moved for leave to file a Response to it. (Docs. 54, 56-59). For the reasons stated below, Defendants' Motion to Dismiss is granted in part and denied in part, Defendants' Motion for Leave to File a Reply is denied, and Defendants' Motion for Leave to File a Response to the Statement of Interest is granted.

After Plaintiff filed her Response to the Motion to Dismiss, Defendants moved for leave to file a Reply brief. (Doc. 54). Ordinarily, no Reply to a Motion to Dismiss is permitted. Local Rule 7.1(B)(3). The Court occasionally permits a Reply to be filed where the Response has raised arguments that the movant could not have anticipated, in order to allow the movant to explain its position as to those

arguments and to assist the Court in fully understanding the issues. Sometimes these new arguments arise because the Response offers facts in addition to those alleged in the Complaint, and the Court believes that a response to those new arguments and facts would be helpful. Here, Defendants claim that a Reply is necessary because Plaintiff's Response included an exhibit that was not included in the Complaint, the instructions accompanying the Standard Form 1034.[1] As explained further below, Defendants' Motion to Dismiss argues, in contradiction of the facts alleged in the Complaint, that Standard Form 1034 does not require a certification of compliance with the contract's terms. In Response to this, Plaintiff included with her Response an exhibit entitled "Invoice Preparation Instructions SF 1034." (Doc. 53-1). The Court does not consider either Defendants' Standard Form 1034 exhibit or the Instructions included as an exhibit to Plaintiff's Response in addressing the Motion to Dismiss, as the well-pleaded allegations of the Complaint, which the Court must take as true, themselves allege the requirement that Defendants certify their compliance in submitting Standard Form 1034. (Doc. 31 ¶ 10). Therefore, the Court does not consider Defendants' Reply to the Motion to Dismiss.

The United States has filed a "Statement of Interest," expressing its position as to Defendants' arguments as the "real party in interest." The Court previously

---

[1]     Reviewing the proposed Reply, the Court also notes that Defendants attempt to use the opportunity to attack Plaintiff's other arguments in her Response, though they do not even arguably rely on any new allegations. Even if it might be proper to consider the Reply insofar as it addresses the Standard Form 1034-related exhibits offered by Defendants and Plaintiff, the Court would certainly not consider the these arguments, as they represent an attempt by Defendants to circumvent the Court's ordinary Motion to Dismiss procedure.

ordered that the United States would be given the opportunity to weigh in before the Court disposed of this suit. (8/13/12 Text Order). The United States' Statement argues that the Motion to Dismiss should be denied. Defendants have moved for leave to file a Response to the Statement of Interest. (Doc. 58). Defendants are not entitled to file a Response, but the Court will permit the filing and consider the Response because the Statement of Interest raises important arguments, to which the Court appreciates a helpful counterargument.

### LEGAL STANDARDS

"In ruling on Rule 12(b)(6) motions, the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc.*, 589 F.3d 901, 904 (7th Cir. 2009) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). To survive a motion to dismiss under 12(b)(6), a plaintiff's complaint must "plead some facts that suggest a right to relief that is beyond the 'speculative level.'" *EEOC v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776-77 (7th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 560-63 (2007)). Though detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 547. "The complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Bissessur v. Indiana University Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557; *Tamayo*, 526 F.3d at 1084).

Under Federal Rule of Civil Procedure 9(b), the circumstances supporting allegations of fraud and mistake must be pled "with particularity."  The "circumstances" include "the who, what, when, where, and how: the first paragraph

3

of any newspaper story." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). "Rule 9(b) must be read together with the general requirements of Rule 8(a) that plaintiff need only plead a 'short and plain statement' to give notice to the defendant of the nature of his claims….The purpose of Rule 9(b) is to give the defendant slightly more notice than under Rule 8." *G.T. Laboratories, Inc. v. Cooper Companies, Inc.*, 92-c-6647, 1994 WL 274982, \*2 (N.D. Ill. June 17, 1994) (*citing Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir. 1975); *Reshall Assoc., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1230 (N.D. Ill. 1990)).

## SUMMARY OF RELEVANT ALLEGATIONS[2]

The Logistics Civil Augmentation Program III ("LOGCAP III") and Logistics Civil Augmentation Program IV ("LOGCAP IV") are programs of the United States Army to hire civilian contractors to provide in-theater logistical support to military personnel in wartime and other operations. Both contracts provide Defendants with reimbursement of their allowable incurred costs based upon submission of Standard Form 1034, and Defendants receive up to a 3% profit for their allowable incurred costs. The "Tour of Duty" clause, in Paragraph H-29 of both LOGCAP contracts provides, in relevant part:

> The contractor may rotate contractor employees into and out of the theater provided that there is no degradation in mission results. For employees who have deployed less than 179 days, the contractor may rotate personnel at his own expense, for employees who have deployed greater than 179 days may be

---

[2]    As noted above, in considering a Motion to Dismiss under Rule 12(b)(6), the Court must accept all of the Complaint's well-pleaded allegations as true and draw all inferences in Plaintiff's favor; the Court adheres to these guidelines in setting forth these background facts, which are all drawn from Plaintiff's Second Amended Complaint. (Doc. 31).

rotated as an allowable cost under the contract. The contractor will coordinate personnel changes with the contracting officer.

The "Tour of Duty" clause assures the maximum continuity of civilian contractor personnel, which is of critical importance to supporting military operations. Plaintiff alleges that the proper interpretation of this clause requires Defendants to bear the expenses relating to the mobilization and demobilization of employees in less than 179 days, no matter the reason for their departure from the theater. Prior to submitting their bid for LOGCAP III on September 26, 2001, Defendants did not dispute this interpretation of the Tour of Duty Clause; Defendants also did not dispute this interpretation before submitting their bid for the LOGCAP IV contract, which was awarded on April 17, 2008.

Plaintiff began working for KBR's Government Compliance Department in 1996. During 1996-2008, she held the position of Senior Manager, Government Compliance at KBR. She was responsible for the LOGCAP III contract beginning in April 2003, and was the primary contact point for KBR with the Defense Contracting Auditing Agency. In May 2008, Plaintiff became Defendants' Chief of Staff for LOGCAP III and later became Defendants' Executive Director for the contract. From June 2009 to November 2009, Plaintiff was Director, Procurement Compliance, KBR Government and Infrastructure, and was responsible for the procurement department and procurement file compliance with Defendants' procurement policies and procedures, as well as the review of terms and conditions from prime contracts. She retired from KBR in November 2009.

The government gave provisional approval to claims for payment from Defendant, subject to the LOGCAP contracts' terms and the applicable sections of

the Federal Acquisition Regulations. Provisional approval means that Defendants were obligated to implement reliable accounting practices to track the length of time personnel remained in theater, disclose personnel leaving in less than 179 days, and refund, as to them, the full amount of unallowable mobilization and demobilization payments provisionally approved by the government, which they did not do.

As explained further below, Defendants knew that they were not permitted to bill the government for the costs of early demobilization. Though Defendants knew that they could not bill the government for the costs associated with employees who left theater in less than 179 days under the Tour of Duty clause, they submitted claims for at least 11,266 of their direct employees who left theater in less than 179 days under LOGCAP III. Defendants also submitted claims to the government for subcontractor personnel who demobilized in less than 179 days while requiring those subcontractors to bear the costs of the employees' mobilization and demobilization costs. In many instances, Defendants' personnel or those of subcontractors were demobilized after the government had provisionally paid the initial mobilization costs, but when those personnel were demobilized after less than 179 days, Defendants did not refund the costs to the government, but instead invoiced the government for the unallowable mobilization costs of personnel hired to replace the early-demobilized personnel. Plaintiff estimates that the United States has paid Defendants substantially more than $200,000,000 in mobilization and demobilization costs for 11,266 direct employees of Defendants' who were demobilized in less than 179 days under LOGCAP III. This estimate does not

include costs for subcontractor personnel and LOGCAP IV personnel. Defendants continue to bill the government for these costs under LOGCAP IV.

To make these claims, Defendants filed Standard Form 1034, which requires a statement that "all payments requested are for appropriate purposes and in accordance with the agreements set forth in the contract." Defendants filed Standard Form 1034s for mobilization expenses for personnel who demobilized prior to the time the invoices were filed; filed Standard Form 1034s for mobilization and demobilization expenses for personnel, including subcontractor personnel, who failed to remain in theater for at least 179 days; filed Standard Form 1034s for mobilization expenses of replacement personnel who filled the vacancies of early-demobilized personnel; failed to disclose and immediately repay or refund the expenses and/or failed to refund the early demobilization payments of subcontractors; and certified that all payments were for appropriate purposes and in accordance with LOGCAP III and IV's requirements. Defendants took each of these actions with actual knowledge that they were false claims, with deliberate ignorance of their truth or falsity, or with reckless disregard of the truth or falsity of them.

In late 2003, Plaintiff learned that Defendants were not tracking the mobilization and demobilization of personnel for purposes of refunding overpayments under LOCGAP III for personnel who departed in less than 179 days. She spoke with Mary Wade, KBR's Senior Contracts Manager for LOGCAP III, about the Tour of Duty clause, and Ms. Wade confirmed that the clause prohibited billing for the costs of personnel deployed less than 179 days. Ms. Wade indicated to

Plaintiff that she told Craig Peterson, Vice President of Operations, Maintenance and Logistics of this meaning of the Tour of Duty clause. In 2004, Plaintiff spoke with Mr. Peterson and raised concerns about personnel leaving in less than 179 days. Mr. Peterson confirmed that he was aware of the clause and of Defendants' failure to disclose the matter to the government. On July 13, 2006, Ms. Wade circulated an internal email instructing, "Don't forget that if the person has been on LOGCAP less than 6mo KBR eats the entire mobe/demobe cost." This email went to a number of KBR employees. In January 2009, in a meeting at which Plaintiff was present, Guy LaBoa, KBR's Principal Program Manager of LOGCAP III, asked Larry Lust, Deputy Principal Program Manager whether Defendants had figured out a way to credit back to the government the payments already made to Defendants when a KBR employee leaves the contract early.

A Project Management Conference of senior executives occurred over several days in January 2009; it included Project Managers, the Senior Leadership Team, and senior functional area managers. During this conference, Ted Herman, KBR's Theater Senior Manager, Human Resources, made a presentation entitled "LOGCAP III Human Resources," including information tracking the number and/or percentage of Defendants' demobilized employees with less than 180 days on the contract. Other employees of Defendants' were aware that Defendants were obligated to pay all costs for demobilized personnel in theater for less than 179 days.

Plaintiff attended internal meetings in 2009 addressing the concern that costs should be treated consistently under both LOGCAP III and LOGCAP IV;

Defendants planned to treat cost items the same under LOGCAP IV as under LOGCAP III. Defendants use the same accounting system and billing procedures under LOGCAP III and IV, and some of the same employees, including Mr. Lust and Mike Mayo, managed both contracts. In March or April 2009, Plaintiff participated in a meeting to review the personnel assigned under the two contracts, at which Mr. LaBoa said that Defendants should consider the date of arrival in theater so as to retain employees who had been in theater less than six months; Mr. Lust affirmed this statement.

Defendants' contracts with their subcontractors require the subcontractors to bear the costs of their employees' early demobilization and to replace those employees at their own expense. Defendants enforced these contracts with their subcontractors, including Integrated Technologies Group, Inc., Wackenhut LLC, and Lear Siegler Services, Inc./EG&G Technical Services, Inc. These contracts were negotiated and prepared by Defendants, and implemented in late 2003 and thereafter; they flow down from the provisions and requirements of the prime LOGCAP III contract. The subcontracts expressly state that the subcontractors must reimburse Defendants for (1) early demobilization costs, and (2) costs to replace all demobilized personnel for all subcontractor personnel who do not complete 180 days of service or who depart the assignment location less than 180 days after deployment. This requirement did not apply where the employee developed a medical condition that prevented his continuing to work or had a severe family hardship.

After the filing of Plaintiff's initial Complaint in this case, the Defense Contract Audit Agency audited Defendants in relation to the requirements of the Tour of Duty clause in LOGCAP III. Plaintiff met with Ms. Wade on September 24, 2009, and informed her that the audit had commenced, and that data regarding personnel who had been in-theater less than 179 days had been requested. Ms. Wade informed Plaintiff that she had previously informed Defendants that they were responsible for the costs associated with personnel leaving in less than 179 days under Clause H-29, and that Defendants had not sought clarification or renegotiation of this clause because its language was clear in not allowing Defendants to bill for such costs. The audit concluded that these costs were unallowable under LOGCAP III, and the United States has demanded repayment for the costs.

## DISCUSSION

In her Complaint, Plaintiff alleges eight counts under the False Claims Act ("FCA") against Defendant:[3] (1) Defendants violated 31 U.S.C. § 3729(a)(1)(A) by

---

[3]   Plaintiff filed the instant suit on March 19, 2009. (Doc. 1). The complaint currently at issue is the Second Amended Complaint, which the Court refers to simply as the "Complaint." (Doc. 31). Before this case was unsealed in October 2012, Plaintiff amended her first complaint, and she amended it again when the case was unsealed upon the United States' election to refrain from intervening. (Docs. 15 & 31).  Plaintiff's claims have thus not yet been challenged by a Motion to Dismiss, and the sufficiency of her allegations has not been considered by the Court.

The FCA was amended in 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111–21, § 4(a)(1), and most of the amendments took effect on May 20, 2009. *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 n. 2 (7th Cir. 2011). Plaintiff cites to both versions in each count of her Complaint, as she alleges the conduct continues on into the present, and is thus now governed by the amended statute. For most of Plaintiff's claims, therefore, both versions of the FCA may govern this case, though it does not appear to make a

knowingly presented a false claim for payment to the United States under LOGCAP III, (2) Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presented a false claim for payment to the United States under LOGCAP IV, (3) Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making a false statement material to a false claim under LOGCAP III, (4) Defendants 31 U.S.C. § 3729(a)(1)(B) by knowingly making a false statement material to a false claim under LOGCAP IV, (5) Defendants violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to get false claims paid under LOGCAP III, (6) Defendants violated 31 U.S.C. § 3729(a)(1)(C) by conspiring to get false claims paid under LOGCAP IV, (7) Defendants violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making or using a false statement to avoid or conceal an obligation to pay money to the United States under LOGCAP III, and (8) Defendants violated 31 U.S.C. § 3729(a)(1)(G) by knowingly making or using a false statement to avoid or conceal an obligation to pay money to the United States under LOGCAP IV.

Plaintiff's claims against Defendants turn on the "Tour of Duty" clause in the LOGCAP contracts: Plaintiff alleges that Defendants submitted claims for payment of mobilization and demobilization costs even when employees left the field in less than 179 days, in violation of the Tour of Duty clause's terms. Defendants' Motion to Dismiss, in turn, is premised on the argument that it reasonably interpreted the

difference to the outcome of the instant Motion to Dismiss, and the Court will refer to the amended language and numbering scheme at this time.

The amendment to 31 U.S.C. § 3729(a)(2), now § 3729(a)(1)(B), though, was made retroactive to all cases pending on June 7, 2008, which of course includes this case. *Yannacopoulos*, 652 F.3d at 822 n. 2. Therefore, Counts 3 and 4 of Plaintiff's Complaint are governed by the amended version of the statute, and the Court will cite only to that version for those counts.

Clause differently than does Plaintiff, to permit payment for employees who left the field in less than 179 days so long as their leaving was not an exercise of Defendants' volition, and that it thus did not knowingly submit false claims for those employees.[4]

## I.   Does a claim of reliance on a "reasonable" interpretation of the governing contract preclude FCA liability?

As noted above, Plaintiff claims in Counts 1 and 2 that Defendants violated 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting false claims for payment to the United States under LOGCAP III and IV, in Counts 5 and 6 that it violated 31 U.S.C. § 3729(a)(3) and 31 U.S.C. § 3729(a)(1)(C) by conspiring to get false claims paid under LOGCAP III and IV, and in Counts 7 and 8 that it violated 31 U.S.C. § 3729(a)(7) and 31 U.S.C. § 3729(a)(1)(G) by knowingly making or using false statements to avoid or conceal an obligation to pay money to the United States under LOGCAP III and IV. Each of these claims requires a showing, *inter alia*,  that Defendants "knowingly presents" a false claim for payment or "knowingly makes…a false…statement material to an obligation to pay…money…to the Government," or that it conspired to do one of these. 31 U.S.C. § 3729(a)(1). The statute defines "knowingly" as "actual knowledge," "deliberate ignorance of the truth or falsity," or "reckless disregard of the truth or falsity of the information." 31

---

[4]    Although Defendants advocates for the "reasonableness" of its interpretation, it does not appear to premise its argument for dismissal on the Court's finding that its interpretation is the correct, authoritative interpretation, but instead argues that any "reasonable" interpretation eliminates the potential for FCA liability. (Doc. 50 at 7). As the Court explains below, the final interpretation of the contract clause, and thus whether Defendants'  interpretation is objectively "false," is a legal question for the Court that is premature to address at this time. The Court therefore focuses only on Defendants'  argument that any "reasonable" interpretation of the clause forecloses FCA liability.

U.S.C. § 3729(b)(1)(A). Specific intent to defraud need not be shown. 31 U.S.C. § 3729(b)(1)(B). Defendants'  challenge to the Complaint lies primarily in the arguments that it did not "knowingly" make a "false" claim or statement because it relied on a "reasonable" interpretation of the relevant contract term. It thus argues for the dismissal of Counts 1, 2, and 5-8.

As noted above, both the LOGCAP III and IV contracts contained the Tour of Duty clause, which reads:

> The contractor may rotate contractor employees into and out of the theater provided that there is no degradation in mission results. For employees who have deployed less than 179 days, the contractor may rotate personnel at his own expense, for employees who have deployed greater than 179 days may be rotated as an allowable cost under the contract. The contractor will coordinate personnel changes with the contracting officer.

Defendants explain that they "understood 'rotate' to be a specific subset of instances in which contractor personnel were transferred to other positions at KBR's discretion." (Doc. 50 at 18).[5] They argue that this is the most reasonable interpretation of the clause in context of the rest of the contract terms and within the practice of military contracting. Plaintiff, on the other hand, asserts that the Tour of Duty clause prevents Defendants from billing the government for employees who remain in theater less than 179 days, for whatever reason. The Court finds that both of these are facially reasonable interpretations of the Tour of Duty Clause,

---

[5]     The Court herein cites to the page numbers assigned by its electronic case filing system, not the page numbers assigned by the parties.

and draws the reasonable inference that Plaintiff's interpretation is the correct one.[6]

Defendants argue that a reasonable interpretation of a contract term cannot lead to an objectively false claim for payment because it is not "false under any reasonable interpretation." (Doc. 50 at 13). While it is true that an innocent misinterpretation or a disputed interpretation of a contract cannot, *standing alone*, support a FCA claim, a deliberate or knowing misinterpretation, even if "reasonable," can give rise to FCA liability. Reasonableness is relevant to the question of whether a misinterpretation was knowing or deliberate, but it is not dispositive of that question or of the question of falsity.[7] *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999) (citing *United States ex. rel.*

---

[6]   This inference is supported by Plaintiff's allegations tending to show that Defendants originally adhered to Plaintiff's interpretation, including internal discussions accepting that interpretation, the practice of requiring subcontractors to bear the costs of their short-term employees, and billing for short-term employees who left the theater at Defendants' discretion. The Court relies on these allegations below to support the inference that Defendants knew that their currently-espoused interpretation was incorrect, but they also give weight to Plaintiff's interpretation of the contract's terms, in that they arguably reflect the parties' true understanding of the contract. Because Plaintiff makes these allegations, it would be inappropriate for the Court to interpret the Tour of Duty clause at this time.

[7]   There are some cases noting that a reasonable interpretation of a technical statute, regulation, or contract that provides for a discretionary application, or one that calls for the exercise of scientific judgment, may preclude a finding of falsity, but that is due to the nature of the governing statute, regulation, or contract: where the governing authority contemplates the contractor's use of its own discretion or scientific judgment, no reasonable interpretation can be "false." See discussions in *Oliver*, 195 F.3d at 463-64 (citing *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465 (9th Cir. 1996); *Luckey v. Baxter Healthcare Corp.*, 2 F.Supp.2d 1034, 1047 (N.D. Ill. 1998), aff'd, 183 F.3d 730 (7th Cir. 1999)). Where a contract uses ordinary language and does not defer to scientific or technical judgments, though, courts must fulfill their traditional role in contract interpretation. *Oliver*, 195 F.3d at 463 (citing *United States v. Mead*, 426 F.2d 118, 122 (9th Cir. 1970); *United States ex. rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1524 (9th Cir. 1995).

*Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1524 (9th Cir. 1995); *United States v. Mead*, 426 F.2d 118, 122 (9th Cir. 1970)). It is for the Court to determine the proper interpretation of the contract's terms, which will resolve whether Defendants' claims were "false" under the statute. *Id.* If they are incorrect, and therefore "false," the Court must determine whether Defendants "knew," as the statute defines that term, that their interpretation was wrong. These are separate inquiries, and the Court cannot make a final decision as to either of them on this Motion to Dismiss. The Court's only role at this stage is to determine whether Plaintiff's allegations, taken as true, are sufficient to raise a claim under the FCA.

The Court herein disagrees with the Eighth Circuit's requirement in *United States ex rel. Hixson v. Health Management Systems, Inc.* that a FCA plaintiff must "show that there is no reasonable interpretation of the law that would make the allegedly false statement true" in order to withstand a motion to dismiss. 613 F.3d 1186, 1191 (8th Cir. 2010); *compare Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) ("If a statement alleged to be false is ambiguous, [plaintiff] must establish the defendant's knowledge of the falsity of the statement, which it can do by introducing evidence of how the statement would have been understood in context. If [plaintiff] shows the defendants certified compliance with the regulation knowing that the [government] interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the [government] interpreted it, any possible ambiguity of the regulations is water under the bridge."). Applied strictly, *Hixson*'s rule would put an impossible burden on the drafters of statutes, regulations, and

government contracts to avoid all potential ambiguity in order to prevent intentional fraud against the government; it would incentivize the intentional twisting of language in order to find profitable erroneous interpretations of the controlling text, even though all those subject to the text were well-aware of its intended meaning.[8] As the Ninth Circuit noted in its amended opinion in *Oliver*, in a FCA action related to claims under government contracts, such as this case, the parties' intent might be "relevant extrinsic evidence…to inform the court's interpretation of the contract" where a contract term is ambiguous. 195 F.3d at 463-64 (citing *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F3d 1402, 1411 (9th Cir. 1995)); *see also United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1356-58 (11th Cir. 2005) (district court erred in determining that claim could not be false because contract was ambiguous, and in disregarding evidence of how contract terms would have been understood by parties in context).

     As pointed out by Defendants, the Seventh Circuit has, in two cases, made statements that might seem to support their argument that a "reasonable"

---

[8]     Perhaps *Hixson* can be squared with the prevailing case law and this Court's application of the FCA by broadening the term "reasonable" to include the understanding that it is not truly "reasonable" for a defendant to choose an interpretation that is wrong in context, and that a "reasonable" interpretation is not made in isolation. In other words, after further development of the evidence, this Court may determine that either Plaintiff's or Defendants' reading of the Tour of Duty clause is erroneous because it is an unreasonable interpretation in light of the contract's overall meaning, or in light of the parties' intentions or behavior, though both parties' interpretation of the text alone is "reasonable." In that sense, the Court could hold, that one party's interpretation is the only reasonable one, in the sense of the only correct one, while the other's is reasonable only insofar as the Tour of Duty clause is read in isolation, but wrong in context. However, this analysis cannot take place on a Motion to Dismiss where Plaintiff's interpretation is facially reasonable and there are allegations showing that Defendants also held to that interpretation.

interpretation of a contract always vitiates FCA liability, but the Court has reviewed these cases and disagrees that they are fatal to Plaintiff's claim, at least at this stage. In *United States ex rel. Lamers v. City of Green Bay*, the Seventh Circuit stated that "[i]nnocent mistakes or negligence are not actionable," "that errors based simply on faulty calculations or flawed reasoning are not false under the FCA," and that "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA." 168 F.3d 1013, 1018 (7th Cir. 1999) (citing *Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996); quoting *Hindo v. University of Health Sciences*, 65 F.3d 608, 613 (7th Cir. 1995); *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir. 1992)). Defendants use these statements to press their claim that a "reasonable" interpretation of a contract, no matter whether the contractor knew that it was actually incorrect, prevents FCA liability. *Lamers*, though, does not stand for this proposition. First, *Lamers* was a summary judgment disposition, not a dismissal at the pleadings stage, and the sufficiency of the plaintiff's evidence was at issue. *Id.* Moreover, the *Lamers* court found that, for one purportedly false statement, the defendant was actually confused as to the requirements, and that the others concerned "minor technical violations" that occurred essentially inadvertently. *Id.* at 1019. In this case, in contrast, Plaintiff alleges that Defendants knowingly submitted requests for payment for costs that were expressly disallowed under the Tour of Duty clause, fully understanding that they were disallowed.

In *United States ex rel. Yannacopoulos v. General Dynamics*, the Seventh Circuit repeated that "mere 'differences in interpretation growing out of a disputed

legal question'" do not give rise to FCA liability. 652 F.3d 818, 836 (7th Cir. 2011) (quoting *Lamers*, 168 F.3d at 1018). Again, unlike here, *Yannacopoulos* considered the plaintiff's evidence, as it considered the district court's grant of summary judgment to the defendant. *Id.* at 821. Contrary to Defendants' argument, the *Yannacopoulos* court actually considered the contract's terms and the evidence of the parties' agreement, and found that the plaintiff's evidence was insufficient to show that the defendant's interpretation was incorrect; it did not merely determine that the defendant's interpretation was "reasonable" on the face of the contract. *Id.* at 837. Neither the *Lamers* nor the *Yannacopoulos* courts endorsed the view that *any* "reasonable" interpretation of a contract that an FCA defendant might develop is sufficient to avoid liability.

In its Response to the Statement of Interest, Defendants raise the specter of different courts coming to different authoritative interpretations of contracts and regulations governing contractors, such that contractors will not know which interpretations are "false" and which are accurate and will thus risk liability under the FCA any time they make a claim. They argue that they should thus be entitled to escape liability merely because their interpretation is "reasonable." First, this is a concern that applies any time two different courts interpret the same source of law, but these situations do not paralyze the court system or individuals' ability to act under the law. More importantly, though, a contractor that is attempting, in good faith, to follow an authoritative interpretation of the applicable term will not be found to have "knowingly" submitted a false claim to the government, even if it has erroneously chosen the "false" interpretation. The lowest level of intent required

under the FCA is to act in reckless disregard for the truth or falsity of the interpretation; a contractor who is aware of a difference of opinion between two equal authorities, and who innocently chooses one of those two authorities, cannot be said to be acting in reckless disregard. *Oliver*, 195 F.3d at 464. Defendants thus need not be concerned that a good faith effort to choose the correct interpretation will result in FCA liability. *See Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir. 1998) ("If a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, absent some specific evidence of knowledge that the claim is false or of intent to deceive.").

As the United States points out in its Statement of Interest, to adopt Defendants' argument would permit contractors to avoid liability by offering a post-hoc "reasonable" interpretation of the contract, with no evaluation of whether that interpretation was chosen with knowledge, willful ignorance, or reckless disregard of whether it was the correct interpretation. The FCA is intended to reach all fraudulent attempts to extract payment from the United States. *United States v. Estate of Rogers*, No. 1:97cv461, 2001 WL 818160, *5 (E.D. Tenn. Jun. 28, 2001) (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968); *American Textile Mfrs. Institute v. The Limited*, 190 F.3d 729, 733 (6th Cir. 1999), *cert. denied*, 529 U.S. 1054 (2000); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)). Contractors should not be permitted to escape liability for *knowingly* choosing a "reasonable," but incorrect, interpretation of a contract or regulation. The requirement that the government or relator prove that the false

claim was made knowingly is sufficient to protect contractors, while holding to a true standard of falsity protects the government from intentional fraud that knowingly takes advantage of an erroneous, but "reasonable" interpretation of a contract term.

Defendants point to a Supreme Court case interpreting the Fair Credit Reporting Act's requirement that violations be "willful," *Safeco Ins. Co. of America v. Burr*, and argues that it indicates that relying on reasonable interpretations of contractual or statutory terms cannot be considered reckless disregard for the accuracy of those interpretations. 551 U.S. 47, 68-70 (2007). In *Safeco*, the Supreme Court held that it need not consider whether there was evidence that the defendant had acted with subjective bad faith in choosing the erroneous interpretation, because there was no evidence that the defendant had any reason to believe that its reasonable interpretation was wrong. *Id.* at 70. Contrary to Defendants' assertions, *Safeco* is not in conflict with the analysis laid out in *Oliver*; indeed, some courts have relied on them alongside one another.[9] *United States ex rel. K & R Ltd. Partnership v. Massachusetts Housing Finance Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (quoting *Safeco*, 551 U.S. 47; citing *Oliver*, 195 F.3d. at 464); *United States ex rel. Streck v. Allergan, Inc.*, 894 F.Supp.2d 584, 596 (E.D. Pa. 2012); *see also United States ex rel. Armfield v. Gills*, 8:07-cv-2374-T-27TBM, 2013 WL 371327, *11-12 (M.D. Fla. Jan. 30, 2013) (citing *Safeco* and *Hixson*, denying summary judgment for defendants because both plaintiff's and defendants' interpretations could be

---

[9]     The Court here assumes that *Safeco*'s rationale is applicable to FCA cases, though at least one court has questioned whether this is the case. *United States v. The Health Alliance of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, *10 (S.D. Ohio Dec. 18, 2008).

reasonable and evidence would permit jury to find for either party). As noted above, courts typically use the reasonableness of an FCA defendant's interpretation of the applicable law or contract term as part of their determination of whether the defendant acted with the requisite level of knowledge in submitting its claim to the government, not in determining whether the claim was false. *See, e.g, K & R*, 530 F.3d at 983; *Commercial Contractors*, 154 F.3d at 1363 (contractor's interpretation of contract was erroneous, and was so unreasonable that it defeated claim of good faith error); *United States ex rel. Colucci v. Beth Israel Medical Center*, 785 F.Supp.2d 303, 316 (S.D. N.Y. 2011) (internal quotation omitted, emphasis in original) ("Where a relator alleges that a claimant's interpretation of an ambiguous regulation renders its claims false under the FCA, falsity is evaluated by examining whether the interpretation is *correct* in light of applicable law; but whether a claimant acted knowingly in submitting a false claim turns on the *reasonableness* of the claimant's interpretation").

In this case, Plaintiff makes sufficient allegations for the Court to infer that Defendants did not simply choose, in good faith, a reasonable interpretation among equal alternatives. Though their interpretation is plausible, there are allegations of "specific evidence of knowledge that the claim is false." *Commercial Contractors*, 154 F.3d at 1366; *see also Armfield*, 2013 WL 371327, *11-12 (evidence giving rise to inference that defendants changed their interpretation of allowable claims in order to increase payments from government precluded summary judgment because jury could conclude that defendants deliberately ignored risk of falsity); *Streck*, 894 F.Supp.2d at 597-98 (citing, *inter alia*, *Safeco*, 551 U.S. at 70) (plaintiff's allegations

sufficient to avoid dismissal where plaintiff alleged specific facts indicating that defendants failed to follow change in rules, and were thus reckless). Plaintiff has amply alleged facts showing that Defendants' managers and executives discussed the Tour of Duty clause in terms of its disallowing billing for employees who served less than 179 days in-theater and that they required their subcontractors to reimburse them on this basis. Moreover, as Plaintiff points out in her Response to the Motion to Dismiss, she has alleged that Defendants' billing for employees who served less than 179 days does not distinguish between those who left at Defendants' discretion and those who left for other reasons, belying the notion that Defendants believed the "may rotate" language to apply only to employees who were removed at Defendants' discretion. These allegations easily raise the inference that Defendants actually interpreted the Tour of Duty clause in the manner Plaintiff advocates, that they knew that their billing for employees who served in-theater for less than 179 days was inappropriate, and that they only adopted their current interpretation as a cover for their fraudulent billings.

The Court cannot say at this stage, assuming the truth of Plaintiff's allegations and drawing all inferences in her favor, that Defendants did not act with at least reckless disregard or willful ignorance of whether its interpretation was correct. The Court does not at this time express an opinion as to whether Defendants' interpretation was "false," or, if so, whether Defendants "knew" of that falsity; both issues await further factual development for disposition at either the summary judgment or trial stages.

## II.    Do Plaintiff's conspiracy allegations in Counts 5 and 6 state a claim upon which relief can be granted?

In addition to arguing that Plaintiff's conspiracy claims must fail because she has not alleged an "objective falsehood," Defendants also assert that she has failed to allege any facts showing an agreement to defraud the government as required by her claims of conspiracy in violation of § 3729(a)(1)(C) in Counts 5 and 6. In addition, Defendants asserts that they, "as a corporate entity, cannot conspire with itself, its subsidiaries, or their employers," and that Plaintiff only alleges agreements between Defendants or their employees. (Doc. 50 at 21). Plaintiff responds by arguing that she has adequately alleged the necessary agreement, and that the intracorporate conspiracy defense does not apply in FCA cases. The United States' Statement of Interest does not address the conspiracy claims. Because it resolves the issue, the Court addresses the intracorporate conspiracy doctrine first.

The Seventh Circuit has held that "general civil conspiracy principles apply" to FCA conspiracy claims. *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir. 1999)  (citing *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991)). The "intracorporate conspiracy doctrine" has been recognized within the Seventh Circuit, and has been held to bar conspiracy claims under 42 U.S.C. § 1985 where all the alleged conspirators are employees of the same corporate entity. *Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108 (7th Cir. 1990). In addition, the Supreme Court has recognized that a parent corporation cannot conspire with its wholly-owned subsidiaries to violate the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Defendants Kellogg Brown

& Root Services, Inc., and Kellogg Brown & Root LLC are wholly-owned subsidiaries of KBR, Inc.

Arguing that the intracorporate conspiracy doctrine does not bar her conspiracy claims, Plaintiff cites to two cases within the Eleventh Circuit applying that Circuit's rule that "the corporate form cannot shield members of the same corporation from liability when they are accused of a criminal conspiracy," and that this "exception should apply 'regardless of whether the criminal conspiracy arises under the federal criminal or civil code.'" *United States ex rel. Beattie v. Comsat Corp.*, 8:96-civ-966-T-24MAP, 2001 WL 35992080, *3 (M.D. Fla. Apr. 18, 2001) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1038, 1040 (11th Cir. 2000)); *see also United States ex rel. Harris v. Lockheed Martin Corp.*, 905 F.Supp.2d 1343, 1354-55 (N.D. Ga.. 2012) (citing *McAndrew*, 206 F.3d at 1034, 1038-39) (same). On the other hand, Defendants point to cases from the District of Maryland and the District of Columbia holding that the intra-corporate conspiracy doctrine bars conspiracy claims wherein the alleged conspirators are either a parent corporation and its wholly-owned subsidiaries, a corporation and its employees, or the co-employees of a corporation. *United States ex rel. Head v. Kane Co.*, 798 F.Supp.2d 186, 201 (D. D.C. 2011) (citing *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F.Supp.2d 108, 117 (D. D.C. 2007)); *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F.Supp.2d 522, 528 (D. Md. 2006) (citing *Copperweld*, 467 U.S. 752).

The Court's research indicates that the Middle District of Florida and the Northern District of Georgia are alone in finding that FCA claims fall into an

exception to the intracorporate conspiracy doctrine; the Court will not follow these courts' lead in this area. In addition to the District Courts for the District of Columbia and the District of Maryland, the District Courts for the Central District of California, District of Arizona, and Northern District of Mississippi have applied the intra-corporate conspiracy doctrine to in FCA cases.[10] *United States ex rel. Ruhe v. Masimo Corp.*, 929 F.Supp.2d 1033, 1037-38 (C.D. Cal. 2012) (citing *Head*, 798 F.Supp.2d at 201; *United States v. Summit Healthcare Ass'n, Inc.*, No. CF-10-8003-PCT-FJM, 2011 WL 814898, *6-7 (D. Ariz. Mar. 3, 2011); *Hoefer v. Fluor Daniel, Inc.*, 92 F.Supp.2d 155, 1057 (C.D. Cal. 2000)); *Summit Healthcare Ass'n, Inc.*, 2011 WL 814898, *6-7 (citations omitted); *United States ex rel. Jamison v. McKesson Corp.*, 2:08cv214-SA-DAS, 2009 WL 3176168, *14 (N.D. Miss. Sept. 29, 2009) (citing *Durcholz*, 189 F.3d at 545 n. 3; *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991); *Brooks*, 423 F.Supp.2d at 528).

As noted above, the Seventh Circuit has held that "general civil conspiracy principles apply" to FCA conspiracy claims. *Durcholz*, 189 F.3d at 545 n. 3 (citing *Murphy*, 937 F.2d at 1039). In *Travis*, applying the intracorporate conspiracy doctrine to suits under 42 U.S.C. § 1985, the Circuit Court observed:

---

[10]    In *United States v. Quad City Prosthetic, Inc.*, Judge Mihm of the Central District of Illinois left open, for further factual development, the question of whether the intracorporate conspiracy doctrine barred either the federal FCA conspiracy claim or the state-law false claims conspiracy claim. 06-4015, 2011 WL 3273142, *8 (C.D. Ill. Aug. 1, 2011) (citing *Whitley v. Taylor Bean & Whitacker Mortgage Corp.*, 607 F.Supp.2d 885, 897 (N.D. Ill.2009) (applying intracorporate conspiracy doctrine to Illinois fraud conspiracy claim)). That case is still in discovery and the question has not yet been answered, and, so far as the Court can tell, no other court within this Circuit has answered the question of whether the intracorporate conspiracy doctrine applies in FCA cases.

> Long before Congress enacted § 1985, Blackstone remarked that the corporation and its managers are "considered as one person in law." Neither the text and structure nor the background of § 1985 imply a decision to discard this understanding, which remains the accepted wisdom. Intra-corporate dealings under § 1985 therefore should receive the same treatment as intra-corporate dealings under the Sherman Act, enacted 19 years later with similar inattention to such details.

*Travis*, 921 F.2d at 110 (citing *Copperweld*, 467 U.S. 752; 10 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 4884 (Lenore M. Zajdel ed. 1986); William Blackstone, 1 COMMENTARIES ON THE LAWS OF ENGLAND 456 (1st ed. 1765)). These premises suggest the propriety of applying the intracorporate conspiracy doctrine to FCA claims, as most of the other district courts to have considered the issue have done. *Beattie* and *Harris*, apparently the only exceptions, were based on an Eleventh Circuit case that extended exception to the intracorporate conspiracy doctrine to § 1985 suits where the plaintiff's allegations also added up to a criminal conspiracy under 18 U.S.C. § 371. *McAndrew*, 206 F.3d at 1034. Here, Plaintiff does not argue that she has alleged a criminal conspiracy, and, as the District Court for the District of Arizona observed in *Summit Healthcare Ass'n, Inc.*, the only possible victim of an FCA conspiracy is the United States, which has the power to prosecute corporations and their employees or subsidiaries criminally if there is a basis for such allegations. 2011 WL 814898, *7.

Other than her citation to *Beattie* and *Harris*, Plaintiff presents no argument against the application of the intracorporate conspiracy doctrine to FCA claims. Just as § 1985 and the Sherman Act do not indicate an intent to depart from the "accepted wisdom" of conspiracy law, nothing about the FCA indicates that its conspiracy claims should be treated differently from other civil conspiracy claims,

and so the Court holds that the intracorporate conspiracy doctrine bars FCA conspiracy claims where all the alleged conspirators are either employees or wholly-owned subsidiaries of the same corporation.

Defendants' Motion to Dismiss is thus granted as to Counts 5 and 6 of Plaintiff's Complaint. Plaintiff does not argue that any entities other than Defendants' employees or the wholly-owned subsidiaries of KBR, Inc. conspired in violation of the FCA. Therefore, amendment of her Complaint to attempt to overcome the intracorporate conspiracy doctrine would be futile, and she is not granted leave to amend these Counts.

**III.   Under Counts 3 and 4, is Plaintiff required to allege that Defendants certified their compliance with the contracts' terms in order to state a claim, and does she so allege?**

In Counts 3 and 4, Plaintiff alleges that Defendants violated § 3729(a)(1)(B) by knowingly making or using "a false record or statement material to a false or fraudulent claim." The claims rely on Defendants' filing of Standard Form 1034 for unallowable expenses, their failing to disclose and repay the unallowable expenses, and their certification that the requested payments were appropriate. Defendants argue that these allegations fail to state a claim because neither LOGCAP contract requires them to certify their compliance with the contracts' provisions in order to be paid, and that Standard Form 1034 does not constitute such a certification of compliance.[11] Whether a certification requirement exists, and what it entails under § 3729(a)(1)(B) appears to be an uncertain question in this Circuit at this time.

---

[11]    In support of this argument, Defendants include as an exhibit to their Response a blank Standard Form 1034, which does not expressly include a certification of compliance. As noted above, Plaintiff countered this argument by

The United States' Statement of Interest correctly points out that the controlling statutory text does not itself require a certification of compliance. Notably, Defendants' Response to the Statement of Interest does not oppose or even address this argument. The False Claims Act was amended in 2009, and § 3729(a)(1)(B), as amended, applies to all cases that were pending on or after June 7, 2008. *Yannacopoulos*, 652 F.3d at 822 n. 2. This amendment changed the latter phrase of the subsection from "to get a false or fraudulent claim paid or approved by the Government" to "material to a false or fraudulent claim." The term "material," in turn, is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Prior to this amendment, some courts had read in a requirement that a contractor expressly or impliedly "certify" its compliance with the governing law or contract when seeking payment of a claim in order for "false statement" liability to attach. *See United States ex rel. Hutcheson v. Blackstone Medical, Inc.*, 647 F.3d 377, 385-88 (1st Cir. 2011) (discussing courts' imposition of "certification" requirement; rejecting such requirement). However, Defendants cite no cases interpreting the statute as amended that require certification.

Under the amended terms of the statute itself, no certification of compliance appears necessary. Under Plaintiff's factual allegations, a Standard Form 1034 requesting payment for short-term employees' mobilization and demobilization costs is a "false record or statement" made or used by Defendants, which was material to

---

attaching the instructions for Standard Form 1034, which note that the filing of Standard Form 1034 constitutes such a certification. Though it could, the Court does not consider either of these exhibits because they are not necessary to the outcome of the Motion to Dismiss.

the government's payment of unallowable costs to Defendants because it influenced the government's payment of those costs; the government would not have paid unless the invoice had been submitted. Simply put, an invoice such as Standard Form 1034 is a statement that payment is due, that is, properly payable, to the entity that submits it.[12] If payment would be improper under the terms of the contract, then an invoice requesting that improper payment is a "false record or statement" that influences the government's payment of money to Defendants. *See United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006) ("[B]ecause the word "certification" does not appear in 31 U.S.C. § 3729(a)(1) or (a)(2), there is no sense in parsing it with the close attention typically attending an exercise in statutory interpretation. So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach."). This is not a case where the contractor allegedly failed to comply with a separate legal requirement regarding kickbacks or potential conflicts of interest. *See, e.g.*, *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*, 214 F.3d 1372

---

[12]      Indeed, Standard Form 1034 itself asks the person submitting it to "certify that this voucher is correct and proper for payment." (Doc. 50-5). If "proper for payment" means anything, it must mean that it is a good faith request for payment in accord with the applicable agreement. It cannot mean "here is a request for payment, which might well include some unallowable expenses, *caveat emptor*." *See United States v. Rogan*, 517 F.3d 449, 542 (7th Cir. 2008) (quoting *Rock Island, Arkansas & Louisiana R.R. v. United States*, 254 U.S. 141, 143 (1920)) ("The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth. As Justice Holmes put it, '[m]en must turn square corners when they deal with the Government.'"). In light of the discussion below, though, the Court does not at this time determine whether this language on the form would constitute a certification of compliance.

(D.C. Cir. 2000) (no FCA claim where contractor violated rule regarding employment former government workers if no certification of such compliance made). In those cases, the separate requirement was not itself part of the contract, and was not necessarily material to the government's payment of the claim; there, certification serves the useful purpose of preventing plaintiffs from using the FCA to police adherence with numerous unrelated rules even where the government does not hinge payment on compliance with those rules.

The case alleged here is, quite simply, the type of claim Congress seems to have intended to reach by the FCA: a contractor sought payment for costs that were expressly disallowed by the contract. If the government knew that the payments sought were for disallowed costs, it would not have paid, and the false statement was thus material to their wrongful payment. *See United States v. Kellogg Brown & Root Services, Inc.*, 800 F.Supp.2d 143, 154-61 (D. D.C. 2011) (quoting *United States v. Sci. Applications Int'l Corp. (SAIC II)*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)) (recognizing theory of FCA liability where contract did not expressly condition payment on compliance with terms, but plaintiff could should show that "contractor withheld information about its noncompliance with material contractual requirements."). *Yannacopoulos*, though, seems to suggest that even post-FERA, the Seventh Circuit might impose a certification requirement. 652 F.3d at 824 (citing *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010); *United States ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)) ("[A] mere breach of contract does not give rise to liability under the

False Claims Act. If the breaching party falsely claims to be in compliance with the contract to obtain payment, however, there may an actionable false claim.").

It is thus uncertain whether certification of compliance with express contractual terms is required under § 3729(a)(1)(B) in the Seventh Circuit, and this Court does not definitively rule on the issue at this time. A final determination is unnecessary at this time because even if certification is required in this Circuit under the amended statute, Plaintiff has adequately alleged that the filing of Standard Form 1034 carries with it an express certification of compliance, and a Motion to Dismiss is not the proper stage at which to contest the veracity of Plaintiff's allegations.[13] In her Complaint, Plaintiff alleges that the filing of Standard Form 1034 carries with it the certification that "all payments requested are for appropriate purposes and in accordance with the agreements set forth in the contract." (Doc. 31 ¶ 10). Defendants acknowledge this allegation, but ask, in essence, for the Court to disbelieve it on the basis of the blank Standard Form 1034 they have submitted. In response to this submission, Plaintiff offered what she

---

[13]    Defendants include with their Response an unpublished opinion from the Eastern District of Virginia, in which the court dismissed the FCA plaintiffs' claims because they had failed to allege that Standard Form 1034 required a certification of compliance. *United States ex rel. Wilson v. Kellogg, Brown & Root, Inc., et al.*, 1:04-cv-595 (E.D. Va. Feb. 5, 2007) (The Court notes that the exhibit appears to be a copy of the opinion faxed from the presiding judge's chambers on February 5, 2007. The case is not available on either of the prevailing commercial research databases, and is not listed on the Eastern District of Virginia's electronic case filing site, so it is impossible for the Court to verify this exhibit's accuracy or to determine its procedural history.) That court held, with minimal analysis, that Standard Form 1034 was not itself a certification of compliance. *Id.* Whether there were instructions accompanying Standard Form 1034, and whether they contained such a certification was not at issue in *Wilson*. Here, Plaintiff has not failed to make the necessary allegation; Defendants simply dispute its accuracy. The case is thus not useful to the Court's analysis.

contends are the instructions accompanying Standard Form 1034, which do contain the language she alleges. Defendants moved to file a Reply, arguing that the purported instructions lack a proper evidentiary foundation and should thus be rejected.

If the Court considers these exhibits and arguments, it will be left with a dispute over the status of evidence that might prove or disprove one of Plaintiff's allegations. At this stage, though, the Court must take Plaintiff's allegations as true, and the factual dispute between Defendants and Plaintiff over whether the filing of Standard Form 1034 was subject to instructions that carried this certification is inappropriate for resolution at this time. Plaintiff need not prove today that Standard Form 1034 carries the certification she alleges; it is enough merely to make a plausible allegation, which she has done. If there is a reasonable evidentiary and legal basis upon which to contest Plaintiff's allegations on this subject, Defendants may do so on a Motion for Summary Judgment or at trial, when Plaintiff will be required to give evidentiary support for her allegations.[14]

The Court denies Defendants' Motion to Dismiss as to Counts 3 and 4.

---

[14]    The Court does not at this time address whether Plaintiff has alleged implied certification, or whether such certification is sufficient under the statute in this Circuit, as express certification is certainly sufficient. *See, e.g.*, *Hutcheson*, 647 F.3d at 385-88; *Kellogg Brown & Root Services, Inc.*, 800 F.Supp.2d at 154-61 (citing *SAIC II*, 626 F.3d at 1266). In *United States ex rel. Yarberry v. Sears Holdings Corp.*, the Southern District of Illinois held that implied certification was "sufficient at the pleading stage." No. 09-cv-00588-MJR-PMF, 2013 WL 1287058, *3 (S.D. Ill. Mar. 28, 2013).

**VI.    Are Plaintiff's allegations sufficiently specific under Federal Rule of Civil Procedure 9(b)?**

As noted above, Rule 9(b) requires that claims of fraud be made with particularity. Defendants argue that Plaintiff's allegations in the Second Amended Complaint are insufficiently specific to meet this standard. The Court disagrees. In order to comport with Rule 9(b), an FCA complaint must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *Lusby*, 570 F.3d at 853 (quoting *DiLeo*, 901 F.2d at 627). Rule 9(b) also provides that "knowledge…may be alleged generally." Here, as outlined above, Plaintiff has specifically set forth the terms of the contract at issue and, in Exhibit 1, which short-term employees' mobilization and demobilization costs were allegedly wrongfully claimed by Defendants. Going beyond the basic Rule 9(b) concerning the allegation of knowledge, Plaintiff's Complaint also sets forth specific facts underlying the allegation that Defendants knew their claims were wrongful.

Defendants assert that FCA plaintiffs must include the actual "invoice or false claim for payment" with their complaints in order to meet the standard of Rule 9(b) because they must show that the defendant presented a false or fraudulent claim to the government. (Doc. 50 at 23-24 (citing *Harrison*, 176 F.3d at 785)). While it is true that Plaintiff must eventually prove that Defendants billed the government as she alleges, she need not produce the relevant invoices at this time. In *Lusby*, the Seventh Circuit held that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit." 570 F.3d at 854. As in *Lusby*, here "the inference that [Plaintiff] proposes is a plausible one:" Plaintiff adequately alleges, as discussed above, that Defendants had to certify their

33

compliance with LOGCAP's terms in order to be paid for the short-term employees' mobilization and demobilization expenses, and that Defendants were paid for those employees. *Id*. It is thus a very likely, and logical inference that Defendants did certify their compliance as required, for at least some significant proportion of the invoices. *Id*. The Court thus denies Defendants' Motion to Dismiss under Rule 9(b).

## CONCLUSION

For the foregoing reasons, Defendants'  Motion to Dismiss (Doc. 49) is GRANTED IN PART AND DENIED IN PART, Defendants' Motion for Leave to File a Reply (Doc. 54) is DENIED, and Defendants'  Motion for Leave to File a Response to the Statement of Interest (Doc. 58) is GRANTED. Counts 5 and 6 of Plaintiff's Second Amended Complaint are DISMISSED. This matter is REFERRED to Magistrate Judge Gorman for further pretrial proceedings. IT IS SO ORDERED.


Entered this <u>24th</u> day of October, 2013.


                              s/ Joe B. McDade
                        JOE BILLY McDADE
                  United States Senior District Judge